ALLEN STALLINGS, plaintiff in error *vs*. THE STATE OF GEORGIA, defendant in error.

(MONTGOMERY, Judge, was providentially prevented from presiding in this case.)

1. The confessions of the defendant having been shown to the Court, to have been *prima facie* freely and voluntarily made, it was not error to allow them to be submitted to the jury, under its charge as to the law applicable thereto, leaving them to give such weight and credit to the confessions as they might believe them entitled to.   (R.)

2. It was the duty of the Court, where the defendant was on trial for the burning of the occupied dwelling house of another, to have charged the jury that they could, by their verdict, if they thought proper to do so, recommend that the defendant be punished by imprisonment in the penitentiary for life, irrespective of the fact whether the conviction was founded on circumstantial evidence or not.   (R.)

3. Where such a recommendation is made, it becomes the duty of the Court to commute the death penalty in accordance therewith.   (R.)

4. The occupation of the dwelling house is an essential element of the offense with which the defendant is charged, and it is not sufficient to show this fact by inference.   (R.)

Criminal law.   Arson.   Confessions.   Recommendation of jury.   Charge of Court.   Before Judge CLARK.   Schley Superior Court.   October Term, 1872.

Allen Stallings was placed on trial for the offense of arson, in this, that he, on the ninth day of June, 1872, in the county of Schley, did set fire to and burn the occupied dwelling house of one W. G. Sims, on the farm and plantation of said Sims, said house not being in a town or city.

The defendant pleaded not guilty.

The only evidence necessary to an understanding of the decision of the Court is that in reference to the confessions of the defendant, and the occupation of the dwelling house which he is charged to have burned.

The evidence in reference to the confessions was as follows:

W. G. SIMS, sworn, says: I live in the southwest corner of Schley county; lived in what was called a four-square house, in Schley county; it belongs to me; it is now burned, was burned on 9th June last; it was burned between 9 o'clock A.

M., and 2 o'clock P. M.; suppose I left home about 9 o'clock A. M. ` That morning my wife and I eat breakfast very early; my wife did the cooking, and she got up and got breakfast; we had the fire made that morning of old rails; before leaving we had occasion to use some warm water, and went to the stove, and there was no fire in the stove; we made none. It was a mild day, a little but not much wind; no fire in the house or yard; the nearest house to the one burned was about one hundred yards; know defendant; he lived from two hundred to two hundred and fifty yards from my house. Prisoner made confessions to me after he was taken up; the house was burned on Sunday, June 9th; he was taken up on Friday following, and made confessions on Saturday; I arrested him; was alone when I arrested him; my father, Mr. Worthy, M. D. Statham, S. D. Sims, Jr., were with me when we went to arrest him; but I was by myself—had no warrant; had my gun; met him and told him to stop, and he asked me several questions; I made no threats; I stopped him and took him back to the road where the others were; his wife was at the well washing, and S. D. Sims, Jr., went to arrest her; we chained him, from one hour to one hour and a half after we arrested them; we chained the woman after supper. What confessions I heard him make were about 10 o'clock A. M., next day, before the Justice of the Peace; I heard no one threaten him; I told him that the truth would not hurt him, and that a lie would not do him any good; this was just after I arrested him, and in answer to an inquiry from him if I was going to kill him? The confessions I heard was just before the committing trial; he was chained with a trace-chain to the post of the house, and round his neck; the woman was chained on one side of the house and he on the other; when we carried them to the Justice the woman and man were chained together; before the confession they were separated, but the chain was around the man at the time of the confessions.

When we took him up at the well he said Ben Brown, his brother-in-law, Gus King and Calvin Brown came to his

house and said that, owing to a difficulty, they wanted to burn my house, and that one night they took him out behind his house, on a hickory log, and threatened to kill him, if he did not burn my house, and that he said I had never done him any harm and that he would not do it; and that in consequence of this threat he promised them he would burn my house, the first chance; and that on the 9th of June they came to his house again, and that he went with them through the patch, back of the garden, to keep the dog off the rest, while they burned, and that they saw the dog in the road, and he then told them that they could go on, and that they went to the house, broke open the window, and set the house on fire; in talking to him again, he said he went with them to the dairy, and that he stopped, and one broke open the window and went in; that was about all he confessed then; we then took him to my father's house, and we went out to pick up the other boys; the next morning he was taken back to my place, and Esquire Battle was examining him about it; about forty to sixty white and blacks were present; he then said that the other boys did not burn the house, but that he did; in answer to the question, why he burned the house, he said he had nothing against me; that I had treated him kindly, but that his wife induced him to burn it; in answer to the question how he got into the house, he said that he put a trough up against a back window, and broke in that window, and that he had some matches in his pocket, and fired with a match some fat lightwood in a box; there was such a trough, such a window, and all the facts he stated answered what I knew to be true. My house stood about one hundred yards from the road; a settlement road; all the rooms were locked up; I had the key; four rooms, eighteen feet square, each with a passage—one room occupied for a dining room and kitchen, with a stove in it; stove put there in December; it was a small stove near the chimney, all the legs on the hearth, and the pipe went into a brick chimney, and up the chimney some feet; the window was about seven feet from the ground; the trough was about nine feet long; the window

Stallings *vs.* The State of Georgia.

was on the back of the house from the road; had other negroes employed on my place, three grown men and three grown women, and some children; his house was from two hundred to three hundred yards from mine; the other houses were just across the road from mine, and about one hundred yards from mine; I sent for Mr. Battle on Saturday morning, to get a warrant and have a commitment trial; about fifty to one hundred people were present; a good deal of feeling was exhibited, and people were of the opinion that he burned the house; Mr. Battle had him off talking to him, when I got back; when Mr. Battle came back with Allen, pretty nearly every one was after Allen about burning the house; Mr. Battle said when he came back that Allen had burned the house, and that we might turn the other boys loose, Calvin Brown, Ben Brown, and Gus King; Margaret was not about there when he confessed; Allen commenced to live with me in' 1870, and worked with me in 1871, and until June, 1872; he was familiar with the premises; he cut the lightwood that was in the house on Saturday evening; I had the gun at my place several days; prisoner was chained for safe keeping; the morning the house was burned Allen was on the lot; I left him on the lot; he came to notify me of my house being on fire; he told me uncle Brad and uncle Stephen were on the lot, and had broken down the front door, and were getting out some of the things; I left about nine o'clock, A. M., my wife and two children with me; locked outside doors, and fastened all the windows but one—closed the blinds of that.

MERIDITH D. STATHAM, sworn, says: I know defendant; on Friday after the house was burned we went down to arrest Allen; Robert and Stephen Sims went ahead; Mr. Worthy and S. D. Sims stayed with me; that evening he acknowledged being concerned in the burning; he said he was not by himself in the business; said his brother-in-law, Calvin, Ben Brown and Gus King had threatened his life, if he didn't burn the house, and he decided to burn it; when the time came they went up behind the patch, and got in and burned the house; but afterwards he denied all that, and said

he burned it through the influence of his wife; this was Saturday morning; I carried him from where he was arrested to Mr. Sims, by myself, on foot. He regretted very much that his wife was not brought along; he said if she was left there she would run away that night he knew; he said it was as much as he could do to stand up in his own shoes, and let her do the same; I heard Mr. Sims' testimony; I recollect what the defendant said about the manner of burning, as Mr. Sims stated; no fear of punishment or hope of reward was held out to him. I heard the confession; it was made at R. G. Sims'; every one there heard what he said; don't know what induced him to confess, I suppose a guilty conscience; he said he broke open a back window, and put up a trough; a good many people were there at the commitment trial; he and his wife were chained together, and the chain was taken off the woman; after that, Mr. Battle and Allen went off and had a talk about twenty or twenty-five minutes; when they came back, Mr. Battle said Allen had made a full and free confession, and cleared every one but his wife and himself; it was then that I heard the confessions. It is an open, level country about the house, cleared up, a grove and flower garden in front; no one threatened Allen after he was arrested.

KINCHEN L. WORTHY, sworn, says: I know defendant. had a conversation with him; I was appointed constable, and brought him to jail in my buggy; I asked him if he was sorry he burned the house, and he said he was; that he went off about one hundred yards and sat down and cried, and that if he had not been afraid, he would have gone back and put it out; no one was present but prisoner; no threats or promises made by me; this conversation was after his commitment trial—same day; he was chained; I was acting as constable; Mr. Henry Sims was behind, with prisoner's wife, in a buggy; Judge Battle was behind in a buggy; don't know exactly how far behind the others were; we were four or five miles from Court ground; I commenced the conversation.

CULLEN L. BATTLE, sworn, says: I know defendant; I went to the place where the house was burned; prisoner was

Stallings *vs.* The State of Georgia.

soon brought there; I told Mr. Sims I would like to talk with prisoner; we walked off to a well and sat down; I asked him if he knew me, he said he did not; I asked him his name, he said Allen Stallings; I said to him that I had been called upon to investigate the case, and if he knew anything about it I would be glad if he would tell me, that I wanted nothing but the truth, and the naked truth, that only; I then said to him, Allen, don't feel intimidated; you shall not be hurt, I am an officer; he said he knew who burned the house; he said one Calvin Brown, and another negro, whose name I don't recollect, burned the house; I asked him if they had any reason, if they had anything against Mr. Sims that made them burn the house; I think he said Calvin Brown was his wife's brother, and was there about Christmas, and asked him if he had got anything from Mr. Sims for the past year, and he said that he had not; he, Calvin Brown, replied, that, if I live with a man for a year and get nothing for it, I will make him suffer for it; I asked him where Calvin lived, and he said down about Dawson; I asked him, where were you when the house was burned; he said he was in the yard, near the house; I asked him how did he set the house on fire; he said that he went in at the window, by a trough—won't be certain he said a trough; I asked him what did he do then; he said he carried in a bottle of spirits of turpentine, and some matches; he said that he then took spirits of turpentine and sprinkled it over the wood in the box, and some over the walls, and touched a match to it; he said Calvin Brown did that; I asked him how far he was from the house; he said about six or eight feet from the window; how long had they been in the settlement, I asked; he answered two or three days; I asked him if they lay in ambush, or hid only; he said he did not know; I asked if anybody saw them but him; he didn't know; he said that he fed them that morning; I asked him where his wife was, if she saw them; not as he knew of, he answered; I asked where his wife was when they eat breakfast; the reply was, she was at the white folk's house; he said she had gone to church or meeting at the time of the burning; he went with his wife

part of the way to church, that morning, and that when he came back was the time the house was burned; I said to him, Allen, this is a grave charge that you have preferred against one of your fellows; I said to him, it is but a short distance to Dawson, I shall have to have Calvin Brown brought, and have you face to face; I got upon my feet then, and told him I would have to attend to this matter; I said to him, Allen, do you intend to stand to what you now state; he replied, you can put it on me if you wish; I replied, Allen I don't want to put it upon anybody; I then started to leave him to walk off; he said I won't put it upon them any longer; I said, Allen what do you mean? Do you mean to say they didn't burn the house? He said that was what he meant; I says Allen, tell me who burned the house, you say you had it burned? He replied, I done it myself; I asked him if he burned it in like manner as he had described the others, and he said he had; I asked him, Allen what made you do it? He said his wife was the cause of it; I asked him if there was or had been any difficulty between Mr. Sims and his wife; he said Mr. Sims had whipped his wife's little son—the boy was not his—and she said that Mr. Sims would be sorry for it; I believe that closed the matter at that time; I walked off; after that I put him upon his trial, and asked him if he was guilty or not guilty, and he replied, "guilty." No threats were made to induce the confession; no promises were made; the investigation was as fair as ever I saw; I reached there about eight o'clock A. M.; hardly anybody was there then; the prisoner was brought in, in about thirty minutes, I think; two or three brought him; I did not see any chain on the woman; the most that I heard was that it was a great loss, and the perpetrators ought to be brought to justice; I said to him, don't be intimidated, Allen, no one shall hurt you, or words to that effect, that I was an officer, and had come to investigate the matter; when he got through telling about Calvin Brown, I got up and asked him if he intended to stand by what he had said; I did not tell him it would be better for him to tell all he knew about it; at the beginning I told him

Stallings *vs.* The State of Georgia.

to tell all he knew about it; I may have told him it would be better for him to tell about it; I told him I wanted to know the whole truth about it; at the time I had the conversation with Allen I had not issued the warrant; I then issued a warrant and put him upon his trial, and he then said he was guilty.

J. S. ALLEN, sworn, says: I know defendant; this is the second time I have ever seen him; I had a conversation with him, others being present, the day he was put in jail; I got to talking with him about burning this house; he confessed that he did it, and told how he did it; Major Baldwin was talking to him; no promises or threats were made to him; he said he was free to tell all about it as he was in the custody of the law; Major Baldwin commenced the conversation, several were present, Mr. Meadows, Mr. Barnes, Judge C. L. Battle and others; Mr. Baldwin told him he was free to tell all he knew about it, that nobody could hurt him, that there was no danger of his being hurt then; this was about a half-hour after he was put in jail; Major Baldwin was a Justice of the Peace at that time.

At the conclusion of the evidence for the prosecution, the defendant moved to exclude all confessions from the consideration of the jury. The motion was overruled by the Court, and the defendant excepted.

The evidence in reference to the occupation of the house shows that W. G. Sims and his wife left the place about 9 o'clock A. M., on the day of the burning, and went to Quebec, about two and a half miles distant, to church. There is no evidence that any one was in the house or on the lot at the time of the arson.

The Court charged the jury as follows, to-wit: " Arson is the malicious and willful burning of the house or out-house of another. The defendant is charged in this bill of indictment with the willful and malicious burning of the occupied dwelling house of Robert (?) Sims, in this county, during the month of June of this year. There are three important ques-

tions of law which it is necessary that you should understand before you can well make up your verdict:

"1st. It is necessary that the proof should satisfy you beyond a reasonable doubt that the house was feloniously burned, that is to say, not accidentally burned, but was burned by some one with the intention of burning it.   When a dwelling house is burned the law presumes that it was accidentally burned, and before you can convict any one upon his confession, no matter how clear, full and satisfactory the confession, nor how freely and voluntarily made, you must be satisfied beyond a reasonable doubt that the house was not accidentally burned, but was burned by some one intentionally.   If you are not satisfied on this subject beyond a reasonable doubt, you will have to acquit the defendant, no matter if he has freely and voluntarily confessed it.

"It may be an inquiry in your minds, how is this fact, whether or not the house was feloniously burned, to be arrived at, if there is an absence of positive proof?   The only rule I can give you is this:   The object of all evidence is the ascertainment of truth; absolute certainty is not attainable; moral and reasonable certainty is all that can be expected in legal investigations.   If, applying this rule, you are morally and reasonably certain that the house was feloniously burned, then the next inquiry is:   Did the defendant commit the deed?   In arriving at a conclusion on this question you have before you all the facts and circumstances, and the confessions of the defendant.

"Confessions of guilt should be received with great caution. To make a confession admissible, it must have been voluntarily made without being induced by another by the slightest hope of benefit or the remotest fear of injury.   If it appears from all the circumstances attending the confession that it was voluntarily made, that there was not the slightest hope of benefit held out to him, nor the remotest fear of injury operating on his mind, that neither hope nor fear induced the confession, then you will receive it as evidence, and give it due weight.   But if you do not believe that the confessions were

freely and voluntarily made, that he made them under the influence of even the slightest hope of benefit, or was moved to make them from the remotest fear of injury, then you will have to reject the confession entirely from your consideration, and if you should reject the evidence, and there is not evidence enough without them to convict, you will acquit the prisoner. If you believe that the confessions were freely and voluntarily made without the slightest hope of benefit or the remotest fear of injury, you will then consider another legal proposition, which is this: A confession alone, uncorroborated by other evidence, will not justify a conviction. There must be other evidence besides the confession. What is that other evidence? The answer is two things: 1st. The burning of the occupied dwelling house of Sims? 2d. The felonious burning. If these two facts are proven to your satisfaction, then there is no need of other corroborating evidence. The corroborating evidence may be strengthened by proof of the presence of the prisoner at or near the burning dwelling, at or about the time of the breaking out of the fire, contradictory statements about being at other places at the time of the fire, if proven, or strange conduct at the church, if proven, and other facts and circumstances may be considered in the investigation, and they may or may not strengthen the corroborating evidence, if any.

"If a confession of guilt is freely and voluntarily made without the slightest hope of benefit or the remotest fear of injury, if everything about them appears fair, there is no legal reason why they should not be received by the jury, and a verdict of guilty found upon them. You should not reject the confessions simply because they were made before a magistrate, nor because the defendant was in chains and under arrest.

"Something more than this is necessary before you can reject the confession, unless you believe that these things operated unduly upon the mind of the prisoner, and induced him to make an involuntary confession. This rule of law is to govern. There must have been the slightest hope of benefit held

out to him or the remotest fear of injury moving him to confess, before you can reject the confessions. If you do not believe that the occupied dwelling house of Sims was burned, and that it was feloniously burned, you will find the defendant not guilty, and if you believe that it is was burned, and that it was feloniously -burned, yet, if you believe that the confessions were freely and voluntarily made, if there is no other supporting evidence, you will find the defendant not guilty. But if you believe that the occupied dwelling house of Sims was burned, and that it was feloniously burned, and that the defendant has confessed the crime, and that the confessions were freely and voluntarily made, you will' find him guilty."

The jury returned a verdict of guilty, and recommended the defendant to the mercy of the Court.

The defendant moved for a new trial upon the following grounds, to-wit:

1st. Because the Court erred in refusing to exclude the aforesaid confessions from the consideration of the jury.

2d. Because the Court erred in its charge to the jury upon the subject of confessions.

3d. Because the verdict was contrary to the law and the evidence.

The motion was overruled, and the defendant excepted upon each of the grounds aforesaid.

The Court sentenced the defendant to be hung. Whereupon he moved to arrest the judgment of the Court upon the ground that the jury had in their verdict recommended him to the mercy of the Court. The motion was overruled, and the defendant excepted, and now assigns error upon each of the grounds aforesaid.

B. B. Hinton; C. B. Hudson; E. H. Worrill; C. T. Goode, for plaintiff in error.

C. F. Crisp, Solicitor General; W. A. Hawkins, for the State.

Stallings *vs*. The State of Georgia.

WARNER, Chief Justice.

1. The defendant was indicted for the offense of arson, and charged with burning the occupied dwelling house of W. G. Sims, on his plantation, in the county of Schley. On the trial the jury found the defendant guilty, and recommended him to the mercy of the Court. The defendant made a motion for a new trial on the several grounds set forth in the record, which was overruled, and the defendant sentenced to be executed. Exceptions were filed to the refusal of the Court to grant the new trial, and the case is brought before this Court for review. We find no error in admitting the confessions of the defendant to be submitted to the jury, nor in the charge of the Court in relation thereto. The confessions of the defendant were shown to the Court to have been, *prima facie*, at least, freely and voluntarily made, and it was not error in the Court in submitting the same to the jury, under its charge, as to the law applicable thereto, leaving them to give such weight and credit to the defendant's confessions as they might believe them entitled to.

2. The 4311th section of the Code declares, that the willful and malicious burning of an occupied dwelling house of another, on a farm or plantation, or elsewhere, shall be punished with death, but the punishment may be commuted in conformity with the provisions of section 4257, of this Code. The 4257th section provides that the punishment of death for murder may be commuted by the sentence of the presiding Judge, when the conviction is founded solely on circumstantial evidence, or if the jury trying the traverse shall so recommend. Now the question is, what is the proper construction to be given to the 4311th section of the Code, which punishes the offense of burning an occupied dwelling house with death? Does it contemplate that the conviction must be on circumstantial evidence alone, or does it contemplate that if the jury trying the traverse shall recommend that the defendant be imprisoned in the penitentiary for life, the pen-

alty shall be commuted? This question is not entirely free of doubt and difficulty. The 4220th section of the old Code is the same as the 4257th section of the new Code, which the Act of 13th December, 1866, refers to; the provisions of which latter Act are substantially embodied in the 4311th section of the new Code. As the law stood in the old Code, section 4275, the burning of the dwelling house of another, on a farm or plantation, was punished by imprisonment in the penitentiary. By the Act of the 8th of March, 1866, the burning of an occupied dwelling house of another, on a farm or plantation, was punished with death.

3. We have shown that the 4220th section of the old Code and the 4257th section of the new Code are the same in relation to the commutation of the death penalty for murder where the conviction for that particular specified offense is founded solely on circumstantial evidence. Then comes the Act of 13th December, 1866, which declares that in *all cases* in which the penalty prescribed by law for *any offense* is death, the sentence may be commuted in conformity with the provisions of the 4220th section of the Code. It was not intended to change the law in relation to the offense of murder; that was already provided for, but the intention was to extend the provisions of that section to all offenses punishable with death, other than murder, that is to say, in all cases, other than murder, where the punishment is death, and the jury shall recommend that the defendant be punished by imprisonment for life in the penitentiary, the presiding Judge may commute the sentence of death, as provided in the 4220th section of the old Code, and the 4257th section of the new Code. It will be observed that the Act of 13th December, 1866, is silent upon the subject of circumstantial evidence, but declares, that in *all cases* in which the penalty of death is prescribed by law for *any offense*, the sentence may be commuted in conformity with the sections 4220, 4257 of the old and new Code. Whatever doubts may exist in our minds as to the proper construction to be given to the Act of 13th December, 1866, substantially embodied in the 4311th section of the new Code, we yield

Stallings *vs.* The State of Georgia.

them *in favorem vitæ,* and hold and decide that it was the duty of the Court below on the trial of the defendant in this case, to have charged the jury, that they could by their verdict, if they thought it proper to do so, recommend that the defendant be punished by imprisonment in the penitentiary for life, and that it was error in the Court in failing to so charge them, and if they had so recommended, then it would have been the duty of the Court to have commuted the penalty in accordance therewith. Such, in our judgment, is the proper construction to be given to the Act of 13th December, 1866, it being the true intent and meaning thereof that the death penalty should be commuted in all cases, other than murder, whenever the jury trying the traverse should so recommend, as provided in cases of a conviction for murder founded solely on circumstantial evidence, in the 4220th and and 4257th sections of the old and new Code. In our judgment the verdict of the jury was contrary to law, in this, that the evidence does not sufficiently establish the fact that the dwelling house was *occupied* at the time it was burned. This was an essential element to constitute the offense, and as it may be punishable with death, unless the penalty should be commuted by the recommendation of the jury, it ought to be clearly proved.

4. The evidence that the house was occupied at the time it was burned, is a matter of inference, rather than of positive proof, from the evidence disclosed in the record.

Let the judgment of the Court below be reversed.