## J. F. HAMLIN V. THE STATE.

### No. 1770. Decided November 2, 1898.

**1. Jury Law—Qualification of Juror—Formed Opinion.**

On the voir dire examination of a juror as to his qualification, he stated that he had formed an opinion from having heard a member of the grand jury which found the indictment express his opinion as to the guilt or innocence of defendant; but what statements the grand juror made as to any fact in the case is not shown. The bill of exceptions, however, does show that the juror further stated that he could give defendant a fair and impartial trial regardless of any opinion he might entertain. Held, the juror's opinion being formed from a purely hearsay source, he was clearly competent.

**2. Evidence—Statements and Declarations of Defendant—Duress.**

Where the environments of the defendant at the time he made the declarations or confession sought to be introduced in evidence are such as raise some question as to whether he was in duress, and whether or not the same were freely and voluntarily made, the rule is that the court is first to determine the admissibility in evidence; and, if admitted, to submit to the jury, under appropriate instructions, the question as to whether they were entirely free and voluntary, considered in the light of all the circumstances, in order that they might determine what degree of credit they would give to them, or whether they would regard them at all. See facts stated which are held not to show duress, and upon the question of the admissibility of the statements and declarations of defendant, are held to have been properly submitted to the jury.

**3. Bill of Exceptions as to Evidence—Can Not Be Aided by the Statements of Facts.**

On appeal, the court is not authorized to refer to the statement of facts to help out a bill of exceptions. It will be presumed that the bill has stated fully the conditions under which the testimony was admitted, and the very grounds of objection to said testimony.

**4. Same—Confessions—Letter Written While in Jail.**

As a predicate for the admission in evidence of a letter containing admissions and confessions written by defendant while in jail, where the officer testified that after defendant was put in jail he had warned him that anything he might say while confined in jail could be used in evidence against him; that subsequently thereafter, but how long is not stated, he saw and read the letter; Held, that in order to avail himself of the objection that he was in custody and had not been properly warned, defendant was bound to show by his bill that such an interval of time had elapsed between the warning given and the seizing of the letter by the officer as would suggest that he, defendant, did not at the time have in mind the warning which had been given him.

**5. Confessions Not Made to the Officer Giving the Warning.**

There is no rule of law which requires that a confession, to be admissible, must be made to the party giving the warning; the contrary is the rule.

**6. Evidence—Letter to Party in Jail.**

A letter written by a defendant in jail to another party also in jail, but not on trial, is not inadmissible, because the latter was in jail and unwarned.

**7. Evidence—Statements of Codefendant While in Jail—Withdrawal of by Court.**

Where the statements of a codefendant not on trial, made while she was in jail, but not inculpatory of defendant, after having been introduced in evidence, are withdrawn from the jury by the court with instructions not to consider the same, Held, if improperly admitted, the subsequent action of the court was calculated to correct the error.

**8. Murder—Letters as Evidence—Identification of.**

On a trial of an accomplice to a murder by poison, where defendant and the wife of deceased were separately indicted for the murder, a letter written by the defendant to the wife prior to the murder, tending to show illicit relations between them, which the deceased had obtained from his wife and shown to his attorney some time before the murder, was sufficiently identified by the attorney, who testified to its contents and to a conversation between himself and the wife at the burial of her husband, in which the said letter was discussed, and in which, in reply to his question as to where the letter was, she stated: "It is in ashes;" that she and her husband had burned it, it being the only letter alluded to or spoken of by them in said conversation.

**9. Same—Principal and Accomplice—Charge.**

On the trial of an accomplice the same evidence is admissible to establish the guilt of the principal as would be admissible if the principal were himself on trial. But the court should in its charge, as was done, properly limit it to the purpose for which it was introduced.

**10. Same—Confessions of Principal After Consummation of the Crime.**

Confessions of a principals made after the consummation of a crime, and in the absence of the accomplice, are admissible to establish the guilt of the principal, but the charge of the court should limit the testimony to that purpose, as was done.

**11. Impeachment of a Witness—Bill of Exceptions.**

A bill of exceptions to the refusal of the court to admit testimony in impeachment of a witness, to be sufficient, should certainly show that said witness was a material witness or should state some facts proved by him which appeared to be material.

**12. Witness—Questions Asked by Court—Bill of Exceptions.**

Where objection is made to the fact that the court propounded certain questions to a witness, the bill of exceptions should show how the court came to ask the questions, or that the questions were leading.

**13. Same—Expert Witness.**

Where an expert witness for defendant in a case of murder by poison stated that he had heard the testimony of the State's expert, who had made the analysis, it was not improper for the court to ask him, upon a hypothetical case which involved all the testimony, what he thought caused the death of deceased.

**14. Murder by Poison—Indictment—"Malice Aforethought."**

It is essential that an indictment for murder by poison should allege that the murder was committed with "malice aforethought," and a failure of the court to submit a charge requiring the jury to believe that the homicide was committed with "malice aforethought" would be error.

**15. Circumstantial Evidence—Charge of Court.**

On a trial for murder by poison, where the court, after giving a proper charge upon circumstantial evidence in accordance with the approved form, added, "It is not required that circumstantial evidence to warrant a conviction must demonstrate the guilt of the defendant beyond the possibility of his innocence;" Held, this addenda is not restrictive of the main charge, nor calculated to mislead or confuse the jury as to the principle announced in the main charge, and though it is unusual as an abstract proposition, it was correct.

**16. Charge as to Murder by Poisoning.**

Where the indictment and proof showed a poisoning by arsenic, only an objection that the charge of the court did not limit the finding to a poison by arsenic, but authorized a conviction upon proof of "a poisoning;" Held, if there had been evidence of any other character of poisoning there might be some foundation for the objection, but there being no such evidence, the objection was futile.

**17. Accomplice to Murder—Charge as to Alibi.**

Where the defendant was charged and on trial as an accomplice to the murder, the court was not required to charge upon the issue of alibi, since the case did not depend upon defendant's presence during the commission of the homicide.

**18. Same—Charge.**

Where the defendant was charged as an accomplice to the murder, a charge of court was correct which limited and restricted to its legitimate purpose all the evidence relating alone to the guilt of the principal and which made defendant's guilt to depend on the evidence only which connected him with the homicide as an accomplice.

**19. Accomplice to Murder—Evidence Sufficient.**

See summary of the evidence, in the opinion, which the court hold amply sufficient to support a verdict and judgment finding appellant guilty as an accomplice to a murder by poison, and assessing the punishment at imprisonment in the penitentiary for life.

APPEAL from the District Court of Coleman. Tried below before Hon. J. O. WOODWARD.

Appeal from a conviction as an accomplice to murder; penalty, imprisonment for life in the penitentiary.

The indictment charged the murder of Walter Holmes, by poison, on or about the 8th day of December, 1896. There were two counts in the indictment, the first charging this appellant, J. F. Hamlin, as a principal in administering the poison to deceased; the second charging Carrie Holmes (wife of deceased) as the principal and appellant as an accomplice, who, though not present when the said Carrie Holmes administered said poison to deceased, prior to the commission of said offense did unlawfully, willfully, and of his malice aforethought, advise, command, and encourage the said Carrie Holmes to commit said offense. The statement of facts is voluminous, but a very clear condensation of all the material facts in evidence will be found in the court's opinion below, and it becomes unnecessary to make any additional statement of the case. The errors complained of and discussed can also be readily compre-

hended from the opinion and the briefs of counsel, and it is unnecessary to give any other independent statement concerning or in elucidation of them.

*Jenkins & McCartney* and *H. C. Randolph,* for appellant.—The court erred in overruling the defendant's challenge for cause of the juror C. A. Parker, the said juror having stated on his void dire that he had talked about the case with his uncle, Dave Parker, who was on the grand jury that found the indictment herein; that said Dave Parker expressed to him an opinion as to the guilt or innocence of the defendant and Mrs. Holmes; that he supposed that the said Dave Parker, being on the grand jury, knew the facts of the case, and that from said opinion, so expressed to him, he formed an opinion as to the guilt or innocence of the defendant and Mrs. Holmes; that he had such opinion now, and should take that opinion with him in the jury box, if accepted as a juryman; that it would require evidence to remove it, and that he could not say until he heard the evidence whether or not he would be influenced by that opinion; and that he did not remember whether or not he had expressed an opinion as to the guilt or innocence of the defendant and Mrs. Holmes; which statement showed that C. A. Parker was not an impartial juryman in the case.

The court erred in overruling the defendant's peremptory challenge of the juror T. M. Templeton, who sat as one of the jurymen on the trial of this cause; the defendant, excluding C. A. Parker (who was peremptorily challenged by the defendant, after his challenge for cause had been overruled), having had only fourteen peremptory challenges.

When a proposed juror answers that he has an opinion as to the guilt or innocence of the defendant, and shows that such opinion was formed from what he considers to be a reliable source, and says that he can not say, until he has heard the evidence, whether or not such opinion would influence his verdict, he is not a fair or impartial juryman. Rothschild v. State, 7 Texas Crim. App., 540; Dreyer v. State, 11 Texas Crim. App., 641; Black v. State, 42 Texas, 380-383; Carroll v. State, 5 Neb., 31, 2 Am. Crim. Rep., 436; People v. McQuade, Law. Rep. Ann. Book 1, pp. 276-279; Coughlin v. People (Ill.), Law. Rep. Ann., Book 19, pp. 62-64; 1 Burr. on Trials, pp. 414-420.

When a challenge for cause has been erroneously overruled, and appellant thereafter exhausts his peremptory challenges, and is tried by a juryman whom he peremptorily challenges, which peremptory challenge would have been effectual but for said·challenge for cause being improperly overruled, it is reversible error.

Appellant challenged C. A. Parker for good cause, as above shown, and his challenge was overruled. He afterwards made fourteen other peremptory challenges, and then challenged T. M. Templeton peremptorily, which challenge was overruled for the reason that the appellant had exhausted his peremptory challenges, and said Templeton sat on the jury

that tried this case. State v. Brown (15 Kan.), 2 Am. Crim. Rep., 423; People v. Casey (96 N. Y.), 4 Am. Crim. Rep., 318.

The court erred in permitting the State's witnesses, Drs. T. A. Hayes and Stanlee, to testify as to the alleged confession of defendant, both as to words spoken by defendant and as to defendant's silence at the house of said Hayes, on February 8, 1897; because said defendant was at said time under duress, and his acts and statements at said time were not free and voluntary, the defendant on that day having been assaulted by said Hayes with a pistol, and having been severely beaten by said Hayes, in which assault said Hayes was aided and encouraged by the presence of said Stanlee, and in which assault the said Hayes manifestly intended to murder the defendant, and the said Hayes having followed the defendant after said assault and again abused him, being aided and encouraged by the presence of said Stanlee, and the defendant being compelled by the threats of said Hayes to come to his (Hayes') house, and being shut up at the time of said conversation with said Hayes and Stanlee in the house of said Hayes, and being, with cause, in fear of his life at said time.

A confession not freely and voluntarily made, but made under duress or influenced by fear, is not admissible in evidence, and this is a question for the court and not for the jury. Cain v. State, 18 Texas, 389; Carter v. State, 37 Texas, 363; Hauck v. State, 1 Texas Crim. App., 359; Womack v. State, 16 Texas Crim. App., 188; Clayton v. State, 21 S. W. Rep., 255; State v. Murry, 29 S. W. Rep., 702; Gardner v. State, 34 S. W. Rep., 946; Owen v. State (Ala.), 6 Am. Crim. Rep., 206; Slatter v. People, 1 Am. Crim. Rep., 31 (the note to this case cites Dutch, N. J., 601, and Com. v. Henry, 1 Gray [Mass.], 487); The Queen v. Thompson (1893), 9 Am. Crim. Rep., 272 (see note to Culver's Case [Mass.], 3 Am. Crim. Rep., 83); Owen v. State (Ala.), 6 Am. Crim. Rep., 206; Rice on Ev., secs. 301, 307, 310, and authorities there cited; Newman v. State, 1 Am. Crim. Rep., 176.

The admission of this alleged confession was wrong: (1) Because appellant was under duress. He was in the house of Dr. Hayes and in the presence of Hayes' father-in-law, Dr. Stanlee. The doors were closed and no one else was present. He had been forced to come under the threat of Hayes, that if he did not do so he would make him "hard to catch." As to these circumstances amounting to duress, though Hayes and Stanlee were not officers, see Warren v. State, 29 Texas, 372. (2) The confession was not freely and voluntarily made, as defined by the common law. 1 Greenl. on Ev., secs. 219-232; 3 Rice on Ev., secs. 310, 311. The appellant was certainly afraid of Hayes, and afraid to deny what he charged him with. If he was influenced by either fear or hope, his confession was not free and voluntary. (3) The circumstances preclude his silence being taken as a confession. "He was not in a position to deny;" "circumstances existed which rendered a denial inexpedient;" "he was not in a position where it would have been fit, suitable, or proper." 1 Am. Crim. Rep., 33. He was more a prisoner than if he had been in jail, for he was not only deprived of his liberty, but was in fear of his life.

The court erred in permitting the State witness Ben Clark to testify, over defendant's objection, that he had seen a letter written by defendant while in jail to Mrs. Holmes, who was also in jail, in effect and substance asking Mrs. Holmes not to "go back on him," and not to "give him away," the defendant at said time being in duress, to wit, in Coleman County jail, on the charge for which he was being tried herein, and said Mrs. Holmes being also in said jail on said charge, and defendant not having been warned as to the effect of said letter as required by law; said statement not being made in his presence or hearing, and the same not being intended as a statement which might be used against him, said letter being obtained from said Mrs. Holmes by force, and the same not being a statement freely and voluntarily made by the defendant.

The court erred in overruling the defendant's motion to exclude the testimony of said Clark as to the contents of a letter written by defendant while in jail to Mrs. Carrie Holmes, because the testimony of said Clark disclosed the fact that the defendant was in jail at said time; that the pretended warning by said witness of the defendant was not recent before the writing of said letter, and that said letter was not intended as a free and voluntary statement to his codefendant, and was obtained from her by force and threats.

When defendant is in jail, a statement made by him is not admissible in evidence unless the same be freely and voluntarily made, after being warned that the same may be used against him. Code Crim. Proc., art. 570; Williams v. State, 10 Texas Crim. App., 527; O'Connel v. State, 10 Texas Crim. App., 570; Marshall v. State, 5 Texas Crim. App., 293; Kennon v. State, 11 Texas Crim. App., 363; Angell v. State, 8 Texas Crim. App., 451; Williams v. State, 37 Texas, 475; Rix v. State, 26 S. W. Rep. 506; Peny v. State, 42 S. W. Rep., 297.

Our contention is: 1. The appellant was not warned at all. About two weeks before this the jailor told the appellant that anything he might do or say while in jail could be used against him. They were not discussing a statement proposed to be made by appellant relative to this case, nor was appellant contemplating making such statement, nor did he thereafter make such statement to the jailer. The statement made to appellant by witness Clark was too general under such circumstances as these to amount to a warning. It was nothing more than an incorrect statement of the law, and, it being presumed that all men know the law, it is presumed that appellant knew that statements made by him while in jail could not be used against him. 2. The so-called warning was not sufficiently recent. It was about two weeks before the letter was written. Had the warning been direct with reference to the matter testified to, it it doubtful if it was sufficiently recent, certainly not when it was only a general and incorrect statement of law. Baker v. State, 38 S. W. Rep., 25.

The court erred in permitting the State witness H. T. Sims to testify, over objection of defendant, as to the contents of a letter shown by Walter Holmes, deceased, to said Sims; because neither Mrs. Holmes nor defendant was present when said letter was shown to said Sims, nor was

said letter ever identified as one ever seen or read by Mrs. Holmes or defendant. Hearsay is not admissible in evidence. Appellant objected (1) because it did not appear that the letter which Mrs. Holmes said was in ashes was the same letter that Sims read; (2) because the letter referred to by Mrs. Holmes was not identified by its contents or otherwise as being the same letter read by Sims; (3) and because it did not appear that Mrs. Holmes knew the contents of the letter referred to by Sims; (4) nor that she had ever seen or heard the letter read, in part, by Sims; which objections were by the court overruled, and the witness Sims was permitted to and did testify to the jury as to the contents of the letter, as above set out.

The court erred in charging the jury as follows: "You are instructed with reference to the testimony of Ben Clark, concerning the contents of a letter from defendant to Carrie Holmes, that you will consider the same, if at all, only on the issue as to the guilt or innocence of the defendant of the offense charged;" because the same is a charge upon the weight of the evidence, and gives undue prominence to said testimony of said Ben Clark, and said evidence should have been left for the consideration of the jury along with the other evidence, and not separately called to their attention.

A charge that gives undue prominence to testimony against the defendant is calculated to influence the jury as to the weight to be given such evidence. Long v. State, 1 Texas Crim. App., 716; Irvine v. State, 20 Texas Crim. App., 41; Barnes v. State, 39 S. W. Rep., 685; Ball v. State, 36 S. W. Rep., 449; Wilson v. State, 36 S. W. Rep., 589; Campbell v. People (109 Ill.), 4 Am. Crim. Rep., 346.

The court erred in refusing to instruct the jury, as requested in special charge number 3, that they would not consider the letter testified to by H. T. Sims as any evidence of the guilt of the defendant, said letter having been shown to said Sims by Walter Holmes, deceased, in the absence of the defendant, and the defendant never having made any statement in reference to said letter.

The defendant has the right to have his defense presented affirmatively. Thompson v. State, 6 S. W. Rep., 298; Ainsworth v. State, 11 Texas Crim. App., 344; Reynolds v. State, 8 Texas Crim. App., 415; Johnson v. State, 43 Texas, 614; McLaughlin v. State, 10 Texas Crim. App., 356; Greta v. State, 9 Texas Crim. App., 434; Irvine v. State, 20 Texas Crim. App., 41.

The court erred in paragraphs 16, 17, and 19 of its charge, in telling the jury that the evidence therein referred to was to be considered by them only as to the issue of the guilt or innocence of the defendant and of Mrs. Carrie Holmes, the innocence of said parties not being in issue in this case.

The court erred in refusing to allow the defendant to prove by Dr. A. Stanlee, the witness for the State, who denied having any unkind feelings for Mrs. Holmes, and for the purpose of showing such unkind feeling, that in March, 1897, for the purpose of having a temporary administrator

appointed upon the community estate of Walter Holmes, deceased, he made an affidavit in writing to the effect that Mrs. Holmes was selling said community property, wasting said estate, and not paying the debts thereof, and that said statements were not in fact true.

Where a witness denies ill will against the defendant, defendant should be allowed to prove acts and words showing such ill will. Hart v. State, 15 Texas Crim. App., 235; Mason v. State, 7 Texas Crim. App., 623; Watts v. State, 18 Texas Crim. App., 384; Lowe v. State, 11 Texas Crim. Apps., 253.

The court erred in permitting the State's witness Sims to call the jury around him, and to state to them in a whisper and in a tone that could not be heard by defendant or his counsel, that he had told Holmes that he, witness, believed that said Holmes' wife and defendant were "frigging," the same being testimony given to the jury not in hearing of the defendant.

On the trial of a felony case all evidence must be given in the presence and in the hearing of the defendant. Wills. C. C., arts. 25, 596; Brown v. State, 38 Texas, 485; Mapes v. State, 13 Texas Crim. App., 90.

The court erred in questioning the witness Dr. Snyder, after his examination both by the State and the defendant had been concluded, said conduct and question on the part of the court being calculated to impress the jury that the court believed that Walter Holmes died from arsenic poisoning, which was a material issue in the case, and that defendant was guilty, and that the court was anxious to see him convicted.

The court should not do anything during the progress of the trial calculated to impress the jury with the idea that the defendant is guilty, or to influence them as to the weight of the evidence.

The examination and cross-examination of the witness Dr. Snyder having been concluded, the court propounded to said witness the following questions: "Did you hear the testimony of Professor Chase?" to which witness answered, "Yes." "Was his analysis of the stomach and liver correctly made?" Witness answered, "Yes." "If you had been present at the time he made the analysis, and found what he says he did find, what would you have pronounced what he found?" Witness replied, "Arsenic." To which appellant excepted for the reasons stated in the above assignment, and for the further reason that said questions called for an opinion, without sufficient predicate being laid for an opinion as an expert.

The court erred in the concluding portion of the fourteenth paragraph of its charge, as follows: "It is not requisite that circumstantial evidence, to warrant a conviction, must demonstrate the guilt of the defendant beyond the possibility of his innocence," because the same is calculated to mislead the jury as to the weight to be given to circumstantial evidence, and practically nullifies the law of circumstantial evidence. Post v. State, 10 Texas Crim. App., 595; Bryant v. State, 16 Texas Crim. App., 148; Harrison v. State, 9 Texas Crim. App., 408; Hunt v. State, 7 Texas Crim. App., 235; State v. Gleim, 31 L. R. A.,

297; Black v. State, 1 Texas Crim. App., 391; Fury v. State, 8 Texas Crim. App., 472; Robertson v. State, 10 Texas Crim. App., 607; Abrom v. State, 35 S. W. Rep., 390.

The court erred in charging the jury, in effect, that the case was made out upon the part of the State, in so far as the charge that Walter Holmes came to his death by being poisoned with arsenic and certain poisonous and noxious substance to the grand jurors unknown, by proof that Walter Holmes came to his death by being poisoned with any poison; the proof being that if said Walter Holmes was poisoned at all, it was with arsenic and nothing else, and that this fact was well known to the grand jury.

Where any material fact necessary to be alleged in an indictment is alleged therein to be to the grand jurors unknown, the State must prove that such fact was not known to the grand jury, and could not have been known to them by the use of reasonable diligence. Williamson v. State, 13 Texas Crim. App., 519; Bish. New C. P., arts. 546-553; Bish. Crim. Ev., sec. 51.

It is error for the court to charge the jury with reference to a state of facts of which there is no evidence. There was no evidence tending to show that Walter Holmes was poisoned with any other poisonous sub- · stance except arsenic. Hence it was error to submit to the jury the question of Holmes being poisoned with any poisonous and noxious substance to the jurors unknown. This proposition needs no citation of authority to sustain it. The court should have submitted to the jury the means of death, and none other, alleged in the indictment, to wit, arsenic. Clubb v. State, 14 Texas Crim. App., 193; Kouns v. State, 3 Texas Crim. App., 14; McGrew v. State, 19 Texas Crim. App., 304; Wallace v. State, 10 Texas Crim. App., 269; Weaver v. State, 24 Texas, 388.

The court erred in the fifteenth paragraph of its charge in instructing the jury that if defendant, without being present, commanded, advised, or encouraged Mrs. Holmes to poison Walter Holmes, he would be guilty of murder in the first degree, the vice in said charge being that under such circumstances the defendant would not be guilty of murder, but would be guilty as an accomplice. Code Crim. Proc., arts. 74, 76, 78, 79, 605; Wills. C. C., sec. 158; Simms v. State, 10 Texas Crim. App., 159; Bean v. State, 17 Texas Crim. App., 70; McKeen v. State, 7 Texas Crim. App., 632; Uselton v. People, 36 N. E. Rep., 952.

The court erred in receiving the verdict of the jury finding the defendant guilty of murder in the first degree, the court having eliminated in its charge the question of principal, and submitted to the jury only the law as to accomplice.

The verdict of the jury must be responsive to the law and facts. The court charged the jury only as to the law of accomplice, thus eliminating whatever evidence, if any, there was as to principal. The jury found the defendant guilty of murder in the first degree. McCoy v. State, 52 Ga., 287, 1 Am. Crim. Rep., 589; Crook v. State, 11 S. W. Rep., 447; Ring v. State, 42 Texas, 282; Huntsman v. State, 12 Texas Crim. App., 625; Brown v. State, 15 Texas Crim. App., 581; Gaither v. State, 21 Texas

Crim. App., 527; Morgan v. State, 18 S. W. Rep., 648; People v. Lyon, 5 Am. Crim. Rep., 11; Neister v. People, 1 Am. Crim. Rep., 101.

The court erred in refusing to give special charge number 2, requested by the defendant, to the effect that the insanity of Mrs. Holmes must be established beyond a reasonable doubt.

The court erred in its charge to the jury upon the question of the insanity of Mrs. Holmes, in that said charge instructed the jury that such insanity must be "clearly proven," and not giving the defendant the benefit of the reasonable doubt upon the whole evidence upon the issue of insanity. Insanity need not be established beyond a reasonable doubt in order to an acquittal.

Upon the issue of insanity the court charged the jury as follows: "It must be clearly proven that at the time of committing the act, if any, the party accused was laboring under such defect of reason from disease of mind as to not know the nature and quality of the act she was doing," etc.; and defendant asked the court to charge the jury that the State must prove the sanity of Mrs. Holmes beyond a reasonable doubt. Davis v. United States, 160 U. S., 469; Law Ed., book 40, pp. 499, 507; Burt v. State, 38 Texas Crim. Rep., 397.

The court erred in failing to instruct the jury as to the law of alibi, the same being made an issue by the evidence in this case.

It is the duty of the court to charge upon every issue raised by the evidence. Hunnicutt v. State, 18 Texas Crim. App., 522; Long v. State, 11 Texas Crim. App., 387; Humphries v. State, 18 Texas Crim. App., 309; Tittle v. State, 31 S. W. Rep., 677; Anderson v. State, 31 S. W. Rep., 673.

The court erred in refusing to instruct the jury as requested by defendant in special charges numbers 4 and 5, that in order for the defendant to be an accomplice he must have advised, aided, or encouraged Mrs. Holmes in the specific offense herein charged, to wit, the poisoning of Walter Holmes, and that although the defendant's words and acts may have suggested to the mind of Mrs. Holmes the idea of taking the life of Walter Holmes, still this would not render the defendant guilty as an accomplice, unless he intended by such acts or words to induce her to take the life of Walter Holmes; and that the word "encourage," as used in the main charge, meant that the acts or words of the defendant must have been intended to induce Mrs. Holmes to take the life of her husband.

To render one guilty as an accomplice, he must intend to have the principal to commit the offense. Mercer v. State, 17 Texas Crim. App., 465; Stevenson v. State, 17 Texas Crim. App., 635, 636; Mercersmith v. State, 8 Texas Crim. App., 213; Wilson v. State, 24 S. W. Rep., 409, 410; Com. v. True, 14 S. W. Rep., 684; Hicks v. United States, 150 U. S., 442; Combs v. Com., 25 S .W. Rep., 592; 1 Whart. Crim. Law, secs. 120, 134; 1 Bish. Crim. Law, secs. 287, 673; Neister v. People, 1 Am. Crim. Rep., 101.

The court erred in refusing to grant the defendant a new trial, because the verdict of the jury is not sustained by the evidence in this:

1.   The evidence does not show beyond a reasonable doubt that Walter Holmes died from arsenic poison, and there was no evidence of his dying from any other poison; the evidence in favor of arsenic poison being that arsenic was found in the stomach and liver of said Holmes over two months after his death, as shown by the testimony of Professor Chase, which tests are shown by Dr. Snyder not to be reliable, and also the alleged confession of Mrs. Holmes that she gave him arsenic.  The evidence against arsenic poisoning was that Holmes did not show the usual symptoms of arsenic poison, and that arsenic being found in his stomach and liver two months after his death, was no evidence of its ante-mortem administration.

2.   The evidence, if it showed that Holmes died from arsenic poison, left it doubtful whether it was given by his wife or taken with suicidal intent.   The evidence was that he was sick six days; that he maintained from the beginning he knew that he was going to die, and notwithstanding the fact that he knew his wife was in love with the defendant, and that he had been specially warned by Sims that she would poison him, he never at any time during his sickness said or did anything to indicate that he suspected that his wife had poisoned him; but, on the contrary, at all times during his sickness, and up to the very time of his death, manifested the utmost confidence in and affection for his wife.

3.   There was no evidence of anything said or done by the defendant, prior to the death of Walter Holmes, to indicate that defendant ever knew of the contemplated death of Walter Holmes, if the same was contemplated by Mrs. Holmes, and no evidence of anything transpiring after the death of Holmes showing that he knew it prior to the time the charge was made by Hayes; and nothing to show that he had any connection with said poisoning, outside of his silence when he is charged by Hayes with being a murderer, which silence was induced by fear; and the testimony of Ben Clark as to the expression in his letter to Mrs. Holmes, not to go back on him, and not to give him away, which expressions are not shown to have referred to the death of Walter Holmes, and which testimony is unreasonable and not probably true.

A verdict not supported by the evidence should be set aside.

*F. L. Snodgrass,* for the State.—1.   The competency of the juror Parker is settled beyond dispute by the following decisions: Suit v. State, 30 Texas Crim. App., 319; Trotter v. State, 37 Texas Crim. Rep., 468; Deon v. State, 37 Texas Crim. Rep., 506; Adams v. State, 35 Texas Crim. Rep., 295.

2.   There was no error as to the court's refusal to sustain defendant's peremptory challenge to the juror Templeton after defendant had already exhausted his peremptory challenges.   The bill of exceptions shows that this juror was competent and unobjectionable.   Loggins v. State, 12 Texas Crim. App., 65; Goodson v. State, 22 S. W. Rep., 20.

3.   There was no error in admitting the confessions of defendant to Drs. Hayes and Stanlee.   The only objection urged to this confession

was that defendant was at the time in duress, and this being the only one urged, this court has no right to consider any other. No threats or abuse were indulged in at the time. There is no evidence of any duress whatever, or any restraint whatever upon his person, or that he was not perfectly free to act as he pleased. Objections not stated are waived. Gilleland v. State, 24 Texas Crim. App., 524; McGlasson v. State, 38 Texas Crim. Rep., 351.

These confessions not being made while in custody of an officer, are governed as to their admissibility by the rule of the common law, and the burden is upon defendant to show that they were not voluntary. Williams v. State, 12 Texas Crim. App., 240; Allen v. State, 12 Texas Crim. App., 191. If an issue be raised as to whether such confessions are voluntary, the settled rule is that the court should submit the same to the jury, as was done in this case. Sparks v. State, 34 Texas Crim. Rep., 86; Paris v. State, 35 Texas Crim. Rep., 92.

Objections urged to the admission in evidence of the letter written by defendant to Mrs. Holmes, while both were confined in jail upon the charge of this murder, were: 1. That defendant was in jail. 2. That he was not warned. 3. It was not a statement, admission, or confession made to the witness. 4. It was not freely made after proper warning. 5. Mrs. Holmes was in duress and she had not been warned.

The writing of the letter by defendant was a purely voluntary act, though he was in jail. The officer testified that he gave defendant the same warning twice at least. The bill of exceptions does not show the length of time after the warning before the letter was seen handed by defendant to one of his attorneys, and by said attorney carried to Mrs. Holmes, but the evidence in the statement of facts shows it was two weeks after the first warning was given.

There is no rule of law requiring that a confession, to be admissible, has to be made to the party, or one giving the warning. All that is required is, that it reasonably comes within the scope of the warning, and be made within a reasonable time thereafter. Martin v. State, 41 S. W. Rep., 620. The bill of exceptions not showing the time of the warning, the statement of facts can not be looked to, and the court will be compelled to presume that it was not too remote. McGlasson v. State, 38 Texas Crim. Rep., 351. The defendant had been warned, and the letter came within the terms and scope of the warning; it was written and seen at a time covered by the warning, was not too remote, and its admission was no abuse of the sound discretion of the court. Baker v. State, 25 Texas Crim. App., 1; Maddox v. State, 41 Texas, 206; Baldwin v. State, 28 S. W. Rep., 951; Martin v. State, 41 S. W. Rep., 620; Burt v. State, 38 Texas Crim. Rep., 397.

4. The testimony of Sims as to the letter shown him by the deceased was admissible, and the letter was fully identified by him. In addition to the testimony of Sims, set out by appellant in his brief, the following additional evidence as to identity of the letter is shown in the statement of facts: Sims testified further: "Walter Holmes had but one letter with

him. Holmes carried the letter off with him." Defendant drew out the following statement made by Walter Holmes, deceased, when he consulted Sims about his troubles. In speaking of the talk (he and his wife, Carrie Holmes, had that morning before he came to see Sims, after he had charged her with being too intimate with Hamlin, and after she had admitted same, and her love for Hamlin, and Hamlin's love for her, and after he told her Hamlin did not love her, but was merely using her, which she protested was untrue, and after she told him she had some letters from Hamlin), he stated to Sims that "he asked her to let him see them, and she told him if he would promise to give them back to her she would. She went and got three letters. He read the first two and handed them back to her, and when he read the third one (which was the one he had with him) he kept that, and told her he wouldn't give that one back to her," and then he got his team, had a further talk with her, and came on to Coleman to see Sims.

In her conversation with Hayes, the night after the burial of Holmes, Mrs. Holmes, at Hayes' house, in speaking to him of her dead husband, said: "I showed Walter a letter from Mr. Hamlin to me, under a promise to me that he would not get mad, but when he read it he took the shotgun and the letter and went to Coleman to see a lawyer and get a divorce. When he came back he said he left the letter in bank at Coleman. He went to sleep, and I got up and slipped the letter out of his pocket and burned it. Oh, I was so happy when I got that letter."

Again, in connection with her confession at Hayes' house, Hayes says she repeated same statement about the letter. Sam Phillips says that at the time "She said she at that time showed him a letter from Hamlin, and that he just raved and cut up." "She said that Walter came back that night, and they sat up nearly all night, and he told her that he left the letter at Coleman with Sims. She said she was too sharp for that, and when he went to sleep she got up and got the letter out of his pocket and burned it."

Mrs. Hayes says: "She said when he come back that night they sat up nearly all night, and that he told her he had left the letter with Sims, but that when he went to sleep she got up and found the letter in his pocket and burned it."

The letter when read in evidence was offered by the State on the issue of Mrs. Holmes' guilt, and the court confined its consideration in the charge solely as to Mrs. Holmes. This was more favorable to the defendant under the evidence than the law authorized, for the reason that after its introduction by the State the defendant on cross-examination fully proved up the letter as having been written by himself, and that it was in his handwriting, and we shall insist under the assignment questioning the sufficiency of the evidence, that this court shall consider same, in connection with the other evidence, on question of defendant's guilt. On cross-examination of Sims defendant drew out the following evidence from Sims concerning the statement of Holmes, to wit: "He (Holmes)

said he had the letter there from Hamlin to her, and showed it to me. I asked him how he knew the letter was from Hamlin, and he said she told him it was from Hamlin, and that he knew his handwriting, and that his handwriting was well known, and was known to a great many people." On re-examination Sims stated, "The letter was signed J. F. Hamlin."

This statement of the evidence completely disposes of all objection urged to this testimony, and makes the admissibility of the testimony beyond any question. The proposition that hearsay evidence is not admissible is not denied, but is a strange proposition to urge against this testimony, as no question of hearsay could possibly be involved in it, for the reason that the contents of the letter were the very point in issue.

5. As to the errors assigned to the charge of the court. The objection urged in the sixteenth assignment of error was not made and exception taken at the trial, nor in the motion for new trial, and will not therefore be considered. Code Crim. Proc., art. 723, as amended by Acts 25th Leg., p. 17. The cases cited by counsel under the twenty-third assignment are not applicable to this case, where the question is as to the correctness of the charge in limiting certain evidence which had been admitted only on certain issues to the purposes for which it was admitted. The acts and statements of Mrs. Holmes, the principal, not in the presence of defendant, were admitted solely as to Mrs. Holmes, and to show her guilt or innocence as principal in the crime. The letter written by Hamlin while in jail was secured from Mrs. Holmes by the jailer. She first denied having it and then declined to give it up, because she had not read it, and wanted to read it first. The jailer told her that if she didn't give it up to him he would come in the cell and get it, and show it to the lawyers. This evidence rendered it of doubtful admissibility against Mrs. Holmes, if it did not clearly show its inadmissibility as to her. Such being the case, the court (considering it not admissible on the issue of her guilt, and it being admissible solely as to defendant) instructed the jury as stated in the assignment. This instruction on the whole is, to say the least of it, to the advantage of defendant, the jury thus being prevented from considering it as to Mrs. Holmes. The charge does not instruct the jury to consider this evidence, but leaves them free to consider same or not, as they see proper, and does not instruct them to consider it against the defendant, nor how they should consider it, authorizing them to consider same, if they saw proper to consider it for any purpose, only on the issue of the guilt or innocence of defendant of the offense charged. The court did not require them to consider this evidence for any purpose, or intimate that they should do so. They were not told that they could consider same either for or against him. The clear patent object of the instruction, which would be apparent to any juror of average intelligence, was that, if they saw proper to consider it at all, they could only consider same on the issue of guilt or innocence of defendant, and had no right to consider it as to Mrs. Holmes.

The fact that this charge submits the innocence as well as the guilt of

the parties constitutes no error in view of other portions of the charge with regard to the reasonable doubt. Nowlen v. State, 33 Texas Crim. Rep., 142.

6. As to defendant's eighth assignment of error. The articles of the Code of Criminal Procedure, cited by counsel in the contention under this assignment, merely say that the defendant shall be confronted with the witnesses, which is also the language of the Constitution, and the second one cited says the defendant shall be present in the court when any proceeding is had in his case when charged with felony. Sims was on the stand testifying, and the defendant was present in open court; if this does not satisfy the demands of the Constitution and the statute, it would be difficult to urge any valid reason why. The bill shows that there were ladies present in the courtroom, and court instructed the witness to speak in a low tone, and he did so, and in his testimony used the word "cracking," which was not as harmless used in the connection in which the witness used it as it would otherwise appear on its face. But defendant says he didn't hear it,—he nor his counsel. The court says it heard it. The bill shows that at this critical juncture the ladies began to leave the room, and it is not to be presumed that in this kind of case the ladies were on the front seats, because they would not likely in this kind of a case risk such a position, and if they were so disposed, it would be against the experience of every practitioner if the graybeards and baldheads in the county had omitted to pre-empt every foot of available space near the front. The ladies evidently heard it. Defendant must not have been listening. In seriousness, however, if the defendant did not hear the witness, or his attorney didn't, he could have asked the witness to repeat his testimony, and if the failure of himself or his counsel to hear a witness would violate the Constitution and statutes of this State, there would be more deaf defendants tried in Texas in the next decade than was ever dreamed of in song or story. Deaf lawyers would monopolize the criminal business. The proposition involved in this contention of appellant certainly has the recommendation of novelty.

7. As to defendant's ninth assignment of error. The witness Snyder claimed to be a chemical expert on the subject of chemical analysis, and was used by defendant as such; and, as an expert, he says he heard the testimony of Professor Chase as to his analysis of the stomach and liver of Holmes, the deceased, and his details of the methods he used in doing so, and the results; and therefore there was nothing improper in the form of the question, as it was predicated on the whole evidence. The questions and their form being free from any objections, and none urged thereto, the right of the court to interrogate the witness certainly is too well recognized to admit of doubt.

8. Where the indictment contains separate counts, one charging defendant as a principal, the other as an accomplice in the murder, the charge of the court limiting the issue to the charge of accomplice is all the election necessary. Moore v. State, 37 Texas Crim. Rep., 552.

9. The objection urged to the opening paragraph or preliminary statement in the charge of the court is without merit. The language used was grammatically and literally correct. If defendant was an accomplice to the murder, he was guilty of the murder. The accomplice is guilty of the same offense as the principal. Carlisle v. State, 31 Texas Crim. Rep., 545.

10. The fact that the concluding sentence of the court's charge upon circumstantial evidence is not usually found in the stereotyped charge, does not constitute error, since it announced a correct proposition of law. Gallaher v. State, 28 Texas Crim. App., 267.

11. The thirtenth assignment of error is as to the court's submitting a murder by poisoning generally, whereas the indictment charged poison by arsenic. The testimony shows, as the State thinks, conclusively, when considered as a whole, that the deceased came to his death by arsenic poisoning, and it is clear, beyond question, that no prejudice could have resulted to defendant from this charge.

It is well settled law in this State that the insanity of the defendant must be clearly proven by him, and that it existed at the very time of the commission of the offense. Smith Case, 19 Texas Crim. Apps., 95; Leache Case, 22 Texas Crim. App., 281; Geibel Case, 28 Texas Crim. App., 151; Smith Case, 31 Texas Crim. App., 14; Lovegrove Case, 31 Texas Crim. Rep., 491.

Article 760, Code of Criminal Procedure, says: "When the defendant is acquitted on the ground of insanity, the jury shall so state in their verdict." It would seem that the defendant comes within the terms of this statute, whether it was because of the insanity of himself or his principal, if he was acquitted on the grounds of insanity. We insist that this charge is not the law as against the State in this case, but it would not become material unless the case is reversed. We contend, that if defendant commanded, encouraged, or advised Mrs. Holmes to commit this offense, that, even if she was insane at the time, defendant would not be entitled to be acquitted, if he intentionally used a crazy instrument to accomplish his purpose.

Defendant was charged with being an accomplice, and that issue alone submitted to the jury; and to be an accomplice it is necessary that he shall not be present at commission of same. There was nothing upon which to base a charge upon alibi. Defendant merely took a general exception to the charge of the court in not submitting the issue of alibi. The evidence did not warrant the submission of such an issue.

The concluding portion of the brief contains a most finished and able argument upon the sufficiency of the evidence to support the conviction, which the Reporter regrets, owing to its length, he is unable to reproduce.

*Mann Trice,* Assistant Attorney-General, also for the State.

HENDERSON, JUDGE.—Appellant was convicted of being an accomplice in murder, and his punishment assessed at confinement in the penitentiary for life; hence this appeal.

It appears from the record that Walter Holmes was the husband of one Carrie Holmes. They lived together as husband and wife a number of years, and had several children. During the last few years prior to the homicide, they lived near the village of Santa Anna, in Coleman County. Appellant was a widower, and lived about 300 or 400 yards from them, and in view from the rear of the Holmes residence. The relations of deceased and his wife appear to have been agreeable until about a year prior to the decease of the former, about which time it appears that an attachment sprang up between her and appellant, which resulted in illicit intercourse between them. This was carried on for some time, until at length deceased became suspicious of his wife. On Tuesday morning, December 1, 1896, he called his wife into the room, and accused her of being too intimate with appellant. She finally admitted the fact, and told him that she loved appellant, and that he loved her. On request she produced certain letters from appellant to her, under promise that deceased, after reading them, would return them to her. He read two letters, and returned them to her, but, on reading the third, he retained it. She became very angry, and threatened him if he did not give it back to her. This deceased refused to do, but at once got in his buggy, took his gun with him, and proceeded to the town of Coleman, and there conferred with his lawyer, Mr. Sims, exhibiting the letter to him. Sims advised him not to return to his home, and not to eat a meal in the house again; that his life would be in danger if he remained at home. On the same morning, appellant was informed by Mrs. Carrie Holmes of what had occurred, and he was warned to beware of her husband. Appellant left on the same morning, going to the little town of Glen Cove, about fifteen or twenty miles distant, and remained there until the latter part of the week, ostensibly organizing a lodge of the Woodmen of the World. Deceased returned to his home on that evening, and slept with his wife that night. He and his wife had some conversation about the matter of her infidelity, and it seems there was something like a reconciliation between them. He did not return the letter to his wife. After he had gone to sleep, his wife got up, found the letter in his pocket, and destroyed it. On Wednesday the deceased was taken violently ill, and he continued so until the following Tuesday, when he died. His wife waited upon him during that time, and he also had the attendance of other persons. Physicians were also called in, and during his illness there were several consultations between the physicians as to his ailment. It does not appear that the physicians were able to determine the nature of his illness; nor does the record indicate any apprehension on their part that deceased was suffering from poison. Appellant returned from Glen Cove on Saturday, before the death of the deceased, but it does not appear that he ever went into the presence of the deceased before his death. He was seen on Sunday or Monday, however, in the rear of the premises of

the deceased, about his barn, and under circumstances that indicated a conference between him and the wife of the deceased. During the burial service, some circumstances occurred which indicated that some suspicion then existed as to the cause of the death of the deceased. The conduct of appellant and Mrs. Carrie Holmes shortly after the death of Holmes became suspicious. On the evening of the burial, Dr. Hayes, a brother-in-law of deceased (after the burial), rode in the buggy with the wife of deceased on her way home, and some conversation occurred between them with reference to deceased. He subsequently had several interviews with her in rgard to his death. On December 12th an interview occurred between Hayes and Mrs. Carrie Holmes at his house, in the hearing of Hayes' wife and one Phillips, who was stationed outside of the house at the window. Mrs. Holmes, in this interview, in effect admitted the illicit relations between herself and appellant, and also that she had poisoned the deceased, but refused to inculpate appellant therein. Subsequently to this, about the 8th of February, Dr. Hayes saw appellant at his office, in the town of Santa Anna, and on the evening of the same day interviewed him by appointment at his (Hayes') house, in regard to the cause of the death of the deceased. During all this time Hayes was busy collecting evidence in the case. On the 20th of February he caused the body of the deceased to be exhumed; and a portion of the intestines, together with a portion of liver and lungs, were placed in a vessel and securely fastened, and sent to a chemist at Fort Worth, to be analyzed and tested as to poisons. Professor Chase, of Fort Worth, finished the analysis of the contents of the stomach on March 5th; and his testimony shows that the stomach contained a large quantity of arsenic,—"in short, the liver, stomach, and duodenum showing altogether about thrce and three-quarter grains of metallic arsenic, or five and a fraction grains of white arsenic." The testimony shows that the ordinary fatal dose of this drug is about two grains. Mrs. Holmes and appellant were indicted for the crime on the 27th of February, 1897, and were both arrested within a short time thereafter and placed in jail. The indictment contains two counts,—one charging appellant as a principal in the homicide, and the other charging him as an accomplice. The court only submitted the question of accomplice to the jury. A great deal of the testimony on the trial relates to the principal in the homicide, alleged to be Mrs. Carrie Holmes. This was limited in the court's charge to that purpose. The testimony connecting appellant with the offense, aside from certain testimony in the nature of confessions, is purely circumstantial. There are thirty-two bills of exception and twenty-seven assignments of error in the record; but we will only discuss such as we deem material to a proper disposition of this case.

Appellant assigns as error the action of the court in regard to the impanelment of the jury. It seems that Parker had stated on his voir dire that he had an opinion, formed from having heard his uncle, who was a member of the grand jury that found the bill of indictment, express his opinion as to the guilt or innocence of the appellant. The bill fails to

show that the grand juror stated to the juror any fact in regard to the case; and the bill further shows that the juror stated that he could give appellant a fair and impartial trial, regardless of any opinion that he might entertain. So far as we are advised, whatever opinion the juror may have entertained was formed from a purely hearsay source. He had talked with no witness, had heard no testimony, and he was clearly a competent juror, under the rule laid down by this court. See Suit v. State, 30 Texas Crim. App., 319; Adams v. State, 35 Texas Crim. Rep., 285; Trotter v. State, 37 Texas Crim. Rep., 468. It is not attempted to be shown that the juror Templeton, who was subsequently taken on the jury, after appellant had exhausted his challenges, was not a fair and impartial juror.

Appellant strenuously urges that the court committed a reversible error in permitting the State to prove by the witnesses Hayes and Stanlee a conversation between them and appellant at the residence of Dr. Hayes on the 8th of February, 1897, said testimony being substantially as follows: Witness told defendant that he (Hayes) and Stanlee wanted him to make a full statement of his and Mrs. Holmes' connection from beginning to end. In reply, he asked Hayes if he would believe him; to which Hayes replied that he would believe him if he told the truth, but that, if he did not tell the truth, he would not believe him. Appellant then stated that his and Mrs. Holmes' relations began last November, a year ago; that she wrote him the first letter, but he paid no attention to it, and that she wrote him a second letter, and he answered it; that he advised her it was wrong. Witness then asked him why he kept it up, to which he replied that she kept on and was so persistent that it became so irresistible that he could not help it, and that he got to loving her. Witness then asked him if that was all, and he said, "Yes; that is all." Witness then said, "How about the twenty-year plan?" to which appellant replied, "That is so; we agreed to marry, and wait for one another twenty years if necessary;" but he told her that Walter Holmes was a stout, robust man, and that he would likely outlive both of them. Witness then asked him about their marriage, and he replied they were to be married on the 17th of December next, if circumstances would permit. Witness then asked him, "What circumstances would prevent it? You are a widower and she a widow." Appellant replied that he did not know. Witness then asked him how he knew Holmes had his gun, and was going to kill him; and he said Mrs. Holmes told him. He was then asked when she told him, and he said, "The day before Holmes got sick." Witness then said to him, "Look here, you planned this whole thing, and are a murderer; and I do not understand how you could have associated with this old man [referring to Dr. Stanlee], and been with him in his office as you have, and be guilty of such a thing;" to which appellant made no reply. Witness then told him he could go, "but asked him to try not to meet us any more on the streets, and to avoid meeting either of us; that we do not want to see you;" and he said he would try to do so as much as he could. The bill of exceptions shows that this testimony was admitted

under the following circumstances: On the morning of that day the witness Hayes had called defendant into his and Dr. Stanlee's office, to have a settlement with him in regard to some transaction. That Dr. Stanlee was the father-in-law of Hayes. Witness used very abusive language to defendant, but said nothing to him about the death of Walter Holmes. That he (Hayes) was armed with a pistol at the time, and, while the altercation was going on, he attempted to close the door of the office. That, in doing so, Hamlin ran against him in getting out of the door. When he did this, Hayes' pistol fell to the floor, and was not picked up or used during the fight. That, as defendant ran against him, Hayes caught him, and they both went out of the door on the sidewalk, and fell in the street. Hayes got defendant down, and was beating him with his fists. That A. C. Weaver came up to where the parties were, and started to interfere; and Dr. Stanlee, who was standing near by, would not permit him to do so. Defendant cried for help, and Hayes continued to beat him until other parties came and pulled him off. Hayes went into his office, and defendant went into the drugstore to have his bruises attended to. Hayes followed defendant into the drugstore, and again violently abused him. That while they were in the back end of the drugstore, and in Dr. Matthews' office, Hayes and Dr. Stanlee told defendant they wanted to have a talk with him, and requested him to come to Hayes' house that evening for that purpose. They told him they would not hurt him, and assured him, upon the honor of a man, that he would not be hurt if he came, and told him, if he did not come, he (Hayes) would make him (defendant) hard to catch. Defendant promised he would come to the house of Hayes; and he came about 2 o'clock that evening, bringing with him his two little boys, aged 14 and 16 years respectively. Said boys remained on the porch of the Hayes house, while defendant went into the house at the request of said Hayes. Dr. Stanlee was sent for, and, after he came, the conversation above set out occurred. Appellant contends that said statements were not freely and voluntarily made by appellant, but were made under duress or fear superinduced by the conduct of Hayes and appellant's environments at the time. It is not pretended here that appellant was under legal arrest or in custody of an officer, nor that Hayes and Stanlee had any authority to restrain or offer any promise or inducement to appellant. The objections to the statements made are solely based on the antecedent circumstances leading up to this meeting, in connection with the surroundings or environments of the parties at that time.

We understand that the same rule is here applicable which applies to a confession at common law (if what was said by appellant at the time can be called a confession). The rule at common law is simply to the effect that it must appear that the confession was freely and voluntarily made before it will be received as evidence against the accused. And confessions were equally as admissible if the party was under arrest or in jail as if made under other circumstances; there being no objection as to the admissibility of the testimony, unless, perhaps, the courts would

more closely scrutinize a confession made by a party under arrest or in jail, in order to ascertain if same was freely and voluntarily made. Our statute, however, changes this rule; and, before a confession made by a party who is under arrest or in jail is receivable in evidence, it must appear that same was freely and voluntarily made after the party had been warned or cautioned by the officer that anything he might say would be used in evidence against him. As stated above, the statements or confessions of the party here were not made while he was under arrest or in jail; but it is claimed that he was under such duress at the time as shows that his said statements were not freely and voluntarily made. The rule at common law, and in most of the States, is that the admissibility of confessions is a question solely for the court. After such admission, however, it is competent for the defendant to introduce before the jury all the testimony tending to show that the confessions were not freely and voluntarily made; and where testimony of this character is introduced, either for the State or the defendant, it is the province of the court to instruct the jury that they can look to all the facts and circumstances in evidence in order to determine the degree of credit they will attach to the confessions. See note to Daniels v. State, 78 Ga., 98, 6 Am. St. Rep., 242; Johnson's Case, 2 Lead. Crim. Cas., 570; Rice v. State, 47 Ala., 38; Young v. State, 68 Ala., 569; State v. Freeman, 12 Ind., 100; State v. Dildy, 72 N. C., 325. And this seems to have been the rule formerly in this State. See Carter v. State, 37 Texas, 362; Cain v. State, 18 Texas, 387. But more recently our courts seem to have adopted the rule, where there is testimony tending to show that the confession is not admissible, as where there is any evidence to the effect that the party was under duress or in jail, and not properly warned after the admission of such testimony by the court, to instruct the jury with regard to such confession that if they believed it was made under duress, or when the party was in jail and not properly warned, and that such confession was not freely and voluntarily made, they would exclude it altogether from their consideration; thus enabling the jury to pass upon the question of law,—that is, the admissibility of the confession. See Speer v. State, 4 Texas Crim. App., 474; Rains v. State, 33 Texas Crim. Rep., 294; Sparks v. State, 34 Texas Crim. Rep., 86; Carlisle v. State, 37 Texas Crim. Rep., 108. And this seems to accord with the practice in Georgia and Massachusetts. See Holsenbake v. State, 45 Ga., 44; Stallings v. State, 47 Ga., 572; Mitchell v. State, 79 Ga., 730; Bailey v. State, 80 Ga., 359; Com. v. Cuffee, 108 Mass., 285; Com. v. Nott, 135 Mass., 269; Com. v. Smith, 119 Mass., 305; Com. v. Preece, 140 Mass., 276. However, whether the jury excluded the evidence altogether, if they determined that it was not freely and voluntarily made, or disregarded it, is the same in practical effect. We quote from Mr. Rice as follows: "When a confession is offered in evidence, the question whether it is voluntary is to be decided primarily by the presiding justice. If he is satisfied that it is voluntary, it is admissible; otherwise, it should be excluded. When there is conflicting testimony, the humane practice is for the judge, if he decides that it is admissible, to

instruct the jury that they may consider all the evidence, and that they should exclude the confession if, upon the whole evidence in the case, they are satisfied that it was not the voluntary act of the defendant." See Rice Crim. Ev., sec. 308.

It will be remarked in this connection that the judge trying this case instructed the jury, in effect, in accordance with the above; so the sole question for our determination is whether the circumstances surounding the declarant Hamlin at the time he made the confessions were of such a character as to show that he was at the time under duress, such as to indicate that his statement was not freely and voluntarily made, and in fact was not the truth. Of course, the surrounding circumstances can always be looked to by the court primarily to determine whether or not there was duress; secondarily, these surrounding circumstances can be looked to by the jury, under instructions from the court, in order to determine what degree of credit they will give the confession, or whether they will regard it at all. See Rice's and Young's Cases, supra; Thomas v. State, 35 Texas Crim. Rep., 180.

Now, do the facts and circumstances in evidence surrounding appellant at the time show that he was under such duress at the time as to render his declarations or statements absolutely inadmissible? The only circumstances tending in this direction are the fight he had with Hayes in the morning, and his request to appellant, a little while after he had knocked 'down and beat him, to come to his house that evening, that he and Stanlee wanted to talk to him (this being coupled with the threat that, if he did not come, he would make him hard to catch), and the further fact that after he arrived at the house that evening, and came in the room, before the interview, Hayes closed the door, and then demanded of him that he make them a full statement of his and Mrs. Holmes' connection with the killing of the deceased, Holmes. It may be conceded that Hamlin did not desire to go to Hayes' house for the interview that evening; yet it does not follow that he was compelled to go. He had ample time afterwards to have invoked the law for his protection if he apprehended trouble should he fail to go, for it was some four or five hours after the request in the morning before the interview in the evening. And, when he arrived there, it may be also conceded that he did not desire to talk about the cause of the death of Holmes, and did not desire to be questioned in regard thereto. But the circumstances fail to show that any threat was either used against him, or that he was coerced to talk. For aught that appears, what he said was voluntary on his part. No arms were exhibited by the parties, and no threat made. He brought his two sons there with him, and at the time of the interview they were on the porch. This view is further manifested from an examination of his conversation at that time. However the statements may be used for the State as more or less incriminative, yet his expressions appear to have been guarded. Indeed, that part of the conversation which was most calculated to prejudice appellant was not what he said, but what Hayes said. But we do not understand the bill to raise an objection to what Hayes may have said; nor does the bill raise any objec-

tion to appellant's silence under the questions and remarks of Hayes. It may be conceded, as stated above, that the environments as shown by the evidence raise some question as to whether the confessions or statements of appellant were entirely free and voluntary; but we do not understand that this would exclude the testimony, the rule being that the court is first to determine the admissibility of the confession, and if there are facts and circumstances tending to show that it was made under duress, and was not entirely free and voluntary, that this matter should be submitted to the jury under appropriate instructions. We could cite a number of cases where such evidence has gone to the jury under circumstances of a more serious nature than is here indicated. See Rice's Case, Young's Case, and Freeman's Case, supra. We know of no case where the testimony of coercion was as slight as in this case where the evidence of confession has been withheld from the jury.

Appellant urges as cause for reversal the admission by the court in evidence of a certain letter shown to have been written by appellant while in jail, to Mrs. Carrie Holmes, who was also in jail, in another cell. The bill substantially shows that the State put the witness Ben Clark on the stand, who testified that he was the jailer of Coleman County; that he had in his custody J. F. Hamlin, who was confined in one cell, and Mrs. Carrie Holmes, who was confined in another cell, both under arrest on the charge of murdering Walter Holmes. The witness stated that he warned the defendant Hamlin, after he was put in jail; that he told him that anything he might say or do while confined in jail could be used in evidence against him; that, after this warning, he saw a letter from defendant to Mrs. Carrie Holmes; that he saw the letter in Mrs. Holmes' cell; that he knew the defendant's handwriting, and the letter was in his handwriting. Said letter was, in substance, as follows: "It commenced, 'Mrs. Holmes, my own dear Nellie.' It was then a love story, telling her how much he loved her, and how true he had been to her, and in several places asked her not to give him away. In one place, I remember, he said, 'I have been true to you, my darling, and I want you to be true to me, and not give me away.' It was signed, 'Your own Jim H.'" All of which, at the time and before the giving in of said testimony, the defendant objected to, for the reasons (1) that defendant, as shown by the statement of said witness at the time of writing said letter, was confined in the Coleman County jail, upon the charge upon which he is now being tried; (2) he was not warned as required by law to make said statement admissible; (3) that it was not an admission, statement, or confession to the witness by defendant; (4) it was not a statement or confession freely made by defendant after proper warning. Mrs. Holmes was under duress at the time of the transaction testified to by the witness, and had not been properly warned, so that the same might be properly used against her or the defendant. Which objections were overruled, and the witness permitted to testify as above set out. We are not authorized to refer to the statement of facts to help out the bill of exceptions. McGlasson v. State, 38 Texas Crim. Rep., 351.

It will be presumed that appellant has stated fully the conditions under which said testimony was admitted, and, furthermore, that he has stated the very ground of his objection to the testimony. Appellant says that he was not warned as required by law to make said statement admissible, and that it was not a statement or confession freely made by appellant after proper warning. If we look back to the prior portion of the bill stating the conditions under which the letter was received, it will be seen that the officer states that he warned defendant after he was put in jail; that he told him that anything he might say or do while confined in jail could be used in evidence against him; that, after this warning, he saw the letter in question. He does not state how long after he gave the warning before he read the letter. For aught that appears, it may have been immediately. At any rate, appellant does not show by the bill, which he was bound to do in order to avail himself of it, that such an interval of time elapsed after the warning and before the witness saw the letter as to suggest that appellant did not at the time have in mind the warning which had been given. He therefore does not bring himself within the rule as laid down in Barth v. State, ante, p. 381. Appellant also says that same was not an admission, statement, or confession made to the witness by the defendant. We know of no rule of law that would require that the statement or confession must be made to the party giving the warning. Indeed, the contrary has been repeatedly held in this State. See Martin v. State (Texas Crim. App.), 41 S. W. Rep., 620. It is said that the statement made—that is, the letter written—was not freely and voluntarily made after warning given. There is no suggestion in the record to sustain this contention. Indeed, it would seem that the letter was written absolutely free from restraint. It was not intended by appellant that it should be seen by the officer, but was intended to influence Mrs. Holmes in her conduct. It would certainly appear, if the circumstances of a case could take a statement of a prisoner out of the statute, that this would be such a one. But it is not necessary to discuss that matter, as we have before seen that the proper warning was given before the letter was written.

Appellant further objects to the introduction of this letter because it was obtained from Mrs. Holmes while she was under arrest. Mrs. Holmes was not on trial, and the statute in this respect does not apply to her. However, if it did, Mrs. Holmes appears to have been warned by the officer.

Appellant further objected to the testimony of Mrs. Holmes while in jail on the ground that her statements were not freely and voluntarily made; that the officer used both threats and persuasion. The explanation of the court to this bill shows that said testimony, after it was introduced, was subsequently, during the trial, excluded from the jury, and they were instructed not to consider same. If this testimony was improperly admitted, it would appear that this subsequent action of the court was calculated to correct the error. We have looked through the bill, however,

in vain, to find that she made any statement inculpatory of the appellant. When asked in regard to his guilt, she invariably stated that he was innocent.

On the trial, the State introduced the contents of another letter purporting to be from defendant to Mrs. Carrie Holmes. The circumstances attending the introduction of this letter were as follows: On Tuesday morning, December 1st, it appears that Holmes had some conversation with his wife, Carrie, at their house, regarding the defendant, and that she produced three letters which he said were from appellant, Hamlin, to her. Walter Holmes read two of these letters and gave them back to her. He read the third, but retained it, and they had quite an altercation in regard to it. On that day he carried this letter to Coleman, some eight or nine miles from Santa Anna, and there showed it to his attorney, Mr. H. T. Sims. The letter, as testified to by Sims, was substantially as follows: "Dear Carrie: You know how well I love you, and we ought to live for one another. I am willing to wait one, two, five, or ten years, if necessary, but it seems a long time to wait. I noticed at church the other day that he is watching us. We will have to be mighty careful, or he will find out about it. If you will hoist your flag of truce, and he is away, I will be there. I often think of the pleasant times we have had at the [stating two capital letters I can not recall]." It was shown in this connection that Sims read the letter, and advised deceased to place that letter in a secure place, and that he had never seen it since. Sims testified further, "that he was at the burial of Walter Holmes, on Wednesday, and while at the graveyard, before the body was interred, Dr. A. Stanlee (the father of Mrs. Carrie Holmes) introduced said Carrie Holmes to him, with the statement that she wanted to have a talk with him (Sims); that he and Mrs. Holmes stepped off a few steps, and the following conversation occurred: Mrs. Holmes said, 'Well, Mr. Sims, I suppose Mr. Holmes told you all about it.' And I said, 'All about your family trouble concerning you and Hamlin?' She said, 'Yes.' I said, 'Well, he told me a good deal about it.' She said, 'Well, it wasn't as bad as you thought it was.' I said, 'Mrs. Holmes, if it was as he stated to me, it was pretty bad.' She said, 'You are the only living person that knows anything about it.' I said, 'No, I am not the only person that knows anything about it.' We then each looked at Dr. Hayes, who was standing near, looking at us; and she said, 'What Dr. Hayes knows about it don't amount to anything.' I said, 'I don't know what Dr. Hayes knows about it, but he is not all.' She then said again, 'You are the only one that knows anything about it.' I then said, 'Mrs. Holmes, where is that letter from Hamlin to you that Mr. Holmes showed me?' She said, 'We got together, made it up, and he forgave us both, and we burned the letter; it's in ashes now.' 'It's in ashes?' I said to her; 'Mr. Holmes promised me he would take that letter, and put it in the bank with his papers in the vault, and preserve it.' She said, 'He didn't do it, but carried it back home, and we burned it.'" This letter was only introduced as evidence against Mrs. Holmes, the principal, and was so limited by the charge of the court. We

understand the grounds of objection to the introduction of this letter to be that the letter that Sims read was not sufficiently identified as the letter that deceased obtained from his wife on Tuesday morning. We are of opinion that said letter was sufficiently identified as the letter Walter Holmes obtained from his wife on Tuesday morning. But one letter was alluded to or spoken of by them, and there was but one letter which deceased and obtained from his wife and read to Sims, and she explicitly told Sims that the letter in question had been burned. If she were on trial, we have no doubt that said testimony would be admissible; and, as the same character of testimony is admissible against the prinicpal in the trial as an accomplice, we hold there was no error in the court's admitting this testimony. See Crook v. State, 27 Texas Crim. App., 198.

Appellant also objected to the confession Mrs. Holmes made at the house of T. M. Hayes, in the presence of said Hayes, his wife, and Sam Phillips, in which she stated that she poisoned Walter Holmes on December 8th, by giving him four doses of arsenic, the first of which was given on Wednesday, December 2, 1896. Appellant objected to this testimony, because the statement was made in the absence of the appellant, and after the death of Walter Holmes. The court admitted this testimony solely for the purpose of showing the guilt of Mrs. Holmes, and in his charge limited it to that purpose. The testimony was admissible for that purpose.

Appellant reserved a bill of exceptions to the action of the court in refusing to allow him to introduce certain testimony, which he claimed was legal evidence in impeachment of said Stanlee. The bill shows that Stanlee was a witness for the State; but it is not shown that he was a material witness, nor what he testified to, save and except that his feelings were friendly towards Mrs. Carrie Holmes. Appellant then proposed to impeach him by showing that he had made an affidavit to secure temporary letters of administration on the estate of Walter Holmes, to the effect that said Carrie Holmes was wasting and selling the community property of said estate, and was wasting the proceeds, and had not and was not paying off any of the debts of said estate; and, further, that he knew the fact to be at the time that Mrs. Holmes had only sold $415 worth of the property of the estate, and had paid $1045 of the debts thereof, paying $620 thereof out of her private estate. Without discussing the question as to whether or not this character of testimony would be admissible in impeachment of the witness, the bill should certainly show that said witness, whom it was sought to impeach, was a material witness for the State, or should state some facts proved by him which appeared to be material.

Appellant also objected to the court propounding certain questions to the witness Snyder, who was introduced as an expert by defendant. The grounds of the objection were that the court should not interfere in the examination of witnesses, and that a hypothetical question was not stated to the witness Snyder. The bill fails to show how the court came to ask the question; and it does not show that the question propounded by the

court was a leading one. The witness stated that he had heard the testimony of the State's expert who had made the analysis, and he was then asked upon the hypothetical case, which involved all the testimony, what he thought caused the death of the deceased. We fail to see any impropriety in this action of the court.

Appellant objected to the second, third, fourth, fifth, seventh, eighth, ninth, tenth, and twelfth paragraphs of the charge of the court. By referring to these charges, it will be observed that they are all charges defining malice, and presenting the charge of malice aforethought as an element in the case. By referring to the indictment, it will be seen that the charging part alleges that "Mrs. Carrie Holmes did then and there unlawfully, with malice aforethought, kill Walter Holmes, by poison; and that the said ·J. F. Hamlin, prior to the commission of the offense, * * * as aforesaid, did unlawfully and willfully, of his malice aforethought, advise, command, and encourage the said Carrie Holmes to commit said offense, the said J. F. Hamlin not being present at the time of the commission of said offense by Carrie Holmes." So that, if the charge be objectionable, the indictment is also. The grounds of appellant's objection are, as we understand it, that our statute makes murder upon express malice a distinct offense, and a homicide by poisoning a distinct offense, and it is not necessary that the latter contain, as an essential element, the charge of malice aforethought. This is not the rule. From time immemorial, a charge of poisoning, as one of its distinctive elements, contains the charge that it was done with malice aforethought. Unless it was· so done, it is not murder. A killing by poisoning may be either negligent or purely accidental homicide. The rule at common law required that an indictment for poisoning contain the allegation "malice aforethought." See Whart. Hom., sec. 735. In 1 Hale, P. C. p. 455, we find: "He that willfully gives poison to another, that hath provoked him or not, is guilty of willful murder. The reason is because it is an act of deliberation, odious in law, and presumes malice." The same rule has been followed in this State. See Tooney v. State, 5 Texas Crim. App., 163. We would, moreover, observe in this connection, that certainly appellant can not be heard to complain, because, if his contention be true, it was only necessary to prove homicide by poisoning; but the indictment superadded to this, and the court instructed the jury accordingly, that there must be both poisoning and malice aforethought. If the court had failed or refused to submit a charge requiring the jury to believe that the homicide was committed with malice aforethought, it would have been error.

The court gave the jury the following charge on circumstantial evidence: "In this case the State relies upon circumstantial evidence for a conviction of the defendant; and you are instructed that, in order to warrant a conviction on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence beyond a reasonable doubt; and all the facts necessary to such conclusion must be consistent with each other and the main fact sought to be proved;

and the circumstances, taken together, must be of a conclusive nature, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty of the guilt of the defendant, and excluding every reasonable hypothesis except the guilt of the defendant. It is not requisite that circumstantial evidence, to warrant a conviction, must demonstrate the guilt of defendant beyond the possibility of his innocence." Counsel reserved a bill of exceptions to this charge on account of the last clause thereof. It was not necessary for the court to have given this last clause, as he had before given a full and complete charge on circumstantial evidence. But the question is: Was the addendum upon the weight of the testimony, and of a nature calculated to injuriously affect or prejudice appellant? This charge is not usual, and a trial court has done its full duty when it has given the ordinary charge on circumstantial evidence. However, the cautionary charge given as an abstract proposition is correct. Whether circumstantial or positive, the evidence in no case is required to be so cogent as to exclude every possibility of defendant's innocence. This is not like the charge in Harrison v. State, 8 Texas Criminal Appeals, 183, 9 Texas Criminal Appeals, 407; nor is it like the charge in Post v. State, 10 Texas Criminal Appeals, 580. In the latter case, however, the court says that, though the charge was upon the weight of evidence, it was not, under the circumstances of that case, of a character to injure the rights of appellant. In White v. State, 19 Texas Criminal Appeals, 343, the charge went to a greater length in being a charge upon the weight of testimony than the charge in this case. The court, however, in that case, says that the main charge given by the court, being a correct enunciation of the law, taken in connection with the qualification, did not mislead or confuse the jury as to the rule of law which had been properly given, and that the same was not prejudicial to the rights of appellant. If said addendum had been calculated to change the rule announced in the main charge, or to modify it, then it might be considered injurious. The main charge instructed the jury that, before they could convict defendant, the testimony must be of a conclusive nature, etc., producing in effect a reasonable and moral certainty that the defendant was guilty, and must further exclude every reasonable hypothesis except his guilt. The addenda in this case merely stated that, while the rule above given was correct, the hypothesis must not present a mere possibility of innocence, but it must present a reasonable hypothesis. We do not regard the charge as stated above as restrictive of the main charge, or as calculated to mislead or confuse the jury as to the principle announced in the main charge.

The charge was given by the court, applying the law to the facts of the case submitted to them, and if they believed that Carrie Holmes, of her malice aforethought, did unlawfully kill Walter Holmes, by poisoning said Walter Holmes, as charged in the indictment, and that defendant aided, etc., as charged in the indictment, they should convict appellant of being an accomplice in said murder. This charge was objected to on the ground that the indictment and proof showed an arsenic poisoning

only. If there was evidence of any other character of poisoning in the record, there might be something in this objection.

Appellant objects to the court's charge on insanity of Mrs. Holmes. The objections are not well taken. The instruction is in accordance with the authorities in this State, beginning with Webb v. State, 5 Texas Criminal Appeals, 596, and down to Burt v. State, 38 Texas Criminal Reports, 397. See, also, White's Ann. Penal Code, par. 51, for collated authorities.

The issue of alibi was not raised in this case. The court submitted alone the charge of an accomplice, and the State's case did not depend on the presence of the defendant during the commission of the homicide.

As to the other matters complained of in the court's charge, we would observe that this case is divided into two phases: First, the guilt of Mrs. Carrie Holmes, as the principal in the murder; and, second, the guilt of appellant, as an accomplice with Mrs. Carrie Holmes. A great mass of testimony was admitted by the court that had reference alone to the guilt of the principal. All the testimony admitted in that connection, we think, was properly admitted, and was properly limited as to its purpose by the court; and appellant's guilt alone was made to depend on the evidence which connected him with the homicide as an accomplice.

The discussion we have given of the court's charge sufficiently shows that there was no error in the refusal of the court to give the requested charges, and we will not further discuss said charges.

Appellant also objects to the conviction in this case, because he alleges that the court was not authorized to hold a term at the time of the trial of said case. We presume that his contention is that the act regulating judicial districts did not authorize the term of court of Coleman County at the time appellant was convicted. Appellant does not furnish us with any data as to his contention in this regard. There is nothing in this contention.

Appellant insists that the verdict of the jury is not sustained by the evidence. We have examined the record thoroughly, and, in our opinion, the verdict is supported by the evidence. Looking at the record, there can be no question as to the guilt of Mrs. Carrie Holmes, the principal. It is abundantly established, both by circumstantial evidence and by her own confessions, that she poisoned her husband with arsenic, administered to him in water four different times during the week before his death; and the circumstances, we think, amply connect appellant as an accomplice in the charge. We summarize the inculpatory facts as far as appellant is concerned, as follows: The testimony showed his illicit relations with Mrs. Carrie Holmes about a year antedating the homicide. This, in connection with the desire to marry her, was the motive which actuated him in getting rid of the deceased. His going to Glen Cove on Tuesday morning, and remaining there until Saturday, is accounted for only on the hypothesis that Mrs. Holmes informed him on that Tuesday morning of the altercation that occurred between herself and her husband previously on that same morning, with reference to the letter which

he (appellant) had written to Mrs. Holmes; and the further fact, as admitted by him, that Mrs. Holmes informed him on that Tuesday morning of what had occurred, and that her husband had gone to Santa Anna armed, and his life was in danger. His conduct during the sickness of deceased, when he was suffering with poison administered by his wife, also tends to show guilty knowledge on his part. Though he lived within half a mile of deceased, was his neighbor, and in the habit of getting milk at his house, after his return from Glen Cove (which was on Saturday before deceased's death, on Tuesday), appellant did not go into his presence, but was seen in the rear of the premises in the vicinity of the barn under circumstances that showed that he and the wife of the deceased had held an interview. This was on Sunday. On the night after the death of the deceased, he was seen to have a private conversation with Mrs. Holmes on the gallery of their house. His conduct at the grave the next day, when the pigeon was turned loose, was a circumstance against him; as was also his conduct on the night after the burial, when he was seized with horrors, saw spirits, and physicians had to be sent for and neighbors called in to attend him; and the further fact that, the next morning after the burial, he had a private interview with Mrs. Carrie Holmes, at the house of Dr. Hayes, which is not explained. Appellant not only admitted his illicit relations with the deceased's wife antedating his death, but also that their marriage was agreed upon. In that connection, he told deceased's wife that Holmes was robust, and was calculated to outlive either one of them; but he said he would wait for her, if it was twenty years. Furthermore, he admitted in January (after the death of deceased, on December 8th) that he and Carrie Holmes were to be married in the coming December, unless something happened. And in addition to all this, as evidence strongly inculpatory, after the homicide he addressed a letter to Mrs. Holmes, avowing his affection and trust in her, and beseeching her " not to give him away." These, and other facts we might mention, it occurs to us, are of a conclusive nature, establishing his guilt beyond any reasonable doubt; and the jury were fully authorized in finding the verdict they did. There being no reversible errors in the record, the judgment is affirmed.

*Affirmed.*

HURT, Presiding Judge, absent.

[NOTE.—Appellant's motion for rehearing, filed November 14, 1898, was overruled without a written opinion, March 1, 1899.—Reporter.]